**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JERRY J. PALMISANO and | ) | |
| KATHY EVANS-PALMISANO, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 12-886 |
| v. | ) | Judge Nora Barry Fischer |
| | ) | |
| STATE FARM FIRE AND CASUALTY | ) | |
| COMPANY, | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I.    INTRODUCTION

In this action, Plaintiffs Jerry J. Palmisano and Kathy Evans-Palmisano ("Plaintiffs")

have sued Defendant State Farm Fire and Casualty Company ("State Farm" or "Defendant") for

breach of contract and bad faith insurance practices in violation of 42 Pa.C.S. § 8371.  (Docket

No. 1-3).  They argue that State Farm breached their homeowners insurance policy by denying

their claim for coverage and indemnity for losses or damages sustained to the foundation of their

home and contend that State Farm engaged in bad faith insurance practices through its

investigation and denial of their insurance claim. (Docket No. 1-3).  Presently before the Court is

a motion to dismiss brought by State Farm, wherein it argues that Plaintiffs' breach of contract

claim is barred by a one-year contractual limitations period set forth in the policy and that

Plaintiffs have failed to sufficiently plead their bad faith claim in light of the pleading standards

under *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544

(2007).  (Docket Nos. 4, 5).  Plaintiffs oppose State Farm's motion and counter that the

contractual limitations clause should not be enforced and that they have sufficiently pled their

bad faith claim.  (Docket No. 8).  For the following reasons, State Farm's Motion is GRANTED.

1

II.    FACTUAL BACKGROUND[1]

   *A. Damage to Plaintiffs' Home*

   Plaintiffs own a two-story home on King Charles Drive in Pittsburgh, Pennsylvania. (Docket No. 1-3 at 2).   Relevant here, the home has a kitchen on the first level and a finished basement.  (*Id.* at 38-41).  The finished basement consists of a game room, bathroom and storage area.  (*Id.*).  The game room is directly below the kitchen.  (*Id.*).  A small crawl space is located beneath the basement and can be accessed through the garage, which is on the street level.  (*Id.*).

   In October of 2010,[2] Plaintiffs discovered damage to their home, including buckling and cracking of the floor in the kitchen and numerous cracks in the walls.  (*Id.* at ¶¶ 8-9).  Plaintiffs hired contractor Greg Cannella of Cannella Construction to inspect the home and determine the cause of the problems.  (*Id.* at ¶ 10).  During his initial inspection, Cannella identified problems with the foundation of the home and a main structural beam in the basement.  (*Id.* at ¶ 12).  Plaintiffs immediately directed Cannella to remedy these issues.  (*Id.* at ¶ 13).

   In the course of conducting the repairs, Cannella cut a hole in the basement floor of the home, and found "that a main sewer pipe had separated, spilling water which pooled in large quantities in the back of the house."  (*Id.* at ¶ 15).  The failed sewer pipe caused the interior wall of the rear portion of the foundation to be covered with approximately five feet of water.  (*Id.* at ¶ 16).  Cannella removed the water with a submersible pump and fixed the damaged sewer pipe.  (*Id.* at ¶ 17).  Cannella later determined "that the foundation had dropped across the rear of the Home by from four to six inches, with the center of the rear foundation having dropped by the

---

[1]       In evaluating a motion to dismiss, this Court must accept the Plaintiffs' well-pleaded allegations as true and construe them in their favor.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949-50 (2009).  The Court may also fully consider the documents which are relied upon in Plaintiffs' Complaint or attached thereto, including the insurance policy, correspondence between the parties and the report produced by Nelson Architectural Engineers. *Lum v. Bank of Am.*, 361 F.3d 217, 222 n. 3 (3d Cir. 2004).

[2]       Plaintiffs do not specify the date of the loss in their Complaint.  However, as is noted below, the documents attached to their Complaint indicate that the date of the loss was October 9, 2010.

largest amount" and that "the sub-base under the rear footer [was] at 36%, well above accepted levels for this type of structure." (*Id.* at ¶¶ 18, 19).  Plaintiffs allege that both they and Cannella "believe that the broken pipe and water spillage was the primary cause of the foundation's failure."  (*Id.* at ¶ 20).

### B. *Plaintiffs' Homeowners Insurance*

Plaintiffs insured their home by purchasing Homeowners Policy No. 38-LD-4477-5 from State Farm.  (*Id.* at ¶ 6).  This policy was initially in effect from October 23, 2009 through October 23, 2010, and was subsequently renewed for two additional one-year terms, the last of which ends on October 23, 2012.[3]  (*Id.*).

The declaration sheet indicates that the Plaintiffs purchased a standard policy with limits of $354,600 for losses to the dwelling and an additional $35,460 for a dwelling extension.  (Docket No. 4-1 at 6).  The policy also provided standard coverage for personal property, personal liability and damage to property of others, although those types of coverage are not at issue in this case.  (*Id.*).  All losses to the dwelling were subject to a $500 deductible and the annual premium for coverage was $1,268.00.  (*Id.*).  Plaintiffs allege that they made all necessary premium payments.  (Docket No. 1-3 at ¶ 49).

The policy sets forth the terms for coverage for the dwelling in Coverage-A.  (Docket No. 4-1 at 11).  The "Losses Insured" for the Coverage A-Dwelling section is broadly drafted, indicating that "[w]e insure for accidental direct physical loss to the property described in

---

[3]     Plaintiffs attached the current version of their homeowners insurance policy to their Complaint (i.e., the version which provides coverage from October 23, 2011 to October 23, 2012).  State Farm has attached the version of the policy in effect on the date of the loss, October 9, 2010, to its motion to dismiss.  (Docket No. 4-1).  Plaintiffs have not disputed that the policy provided by State Farm is the correct version, (*see* Docket No. 8), and the policy provides that "[t]his policy applies only to loss under Section I … which occurs during the period this policy is in effect.")).  As such, the Court considers the policy in effect on the date of the loss.

Coverage A, except as provided in SECTION I – LOSSES NOT INSURED." (*Id.* at 15-16).

The exclusions found in that section include the following:

> 2.  We do not insure under any coverage for any loss which would not have occurred in the absence of one or more of the following excluded events.  We do not insure for such  loss regardless of: (a) the cause of the excluded event; or (b) others causes of the loss; or (c) whether other causes acted concurrently or in any sequence with the excluded event to produce the loss; or (d) whether the event occurs suddenly or gradually, involves isolated or widespread damages, arises from natural or external forces, or occurs as a result of any combination of these:
>
> …
>
> b.   **Earth Movement**, meaning the sinking, rising, shifting, expanding or contracting of earth, all whether combined with water or not.  Earth  movement includes but is not limited to earthquake, landslide, mudflow, mudslide, sinkhole, subsidence, erosion or movement resulting from improper compaction, site selection or any other external forces.
>
> c.    **Water Damage,** meaning:
>
>   (3) water below the surface of the ground, including water which exerts pressure on, or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure.
>
> …
>
> 3.   We do not insure under any coverage for any loss consisting of one or more of the items below.  Further, we do not insure for loss described in paragraphs 1 and 2 immediately above regardless of whether one or more of the following: (a) directly or indirectly cause, contribute to or aggravate the loss; or (b) occur before, at the same time, or after the loss or any other cause of the loss:
>
> …
>
> b.    defect, weakness, inadequacy, fault or unsoundness in:
>    (1)  planning, zoning, development, surveying, siting;
>    (2)  design, specifications, workmanship, construction, grading, compaction;
>    (3)  materials used in construction or repair; or
>    (4)  maintenance.

(*Id.* at 17-18).   Among the many "Conditions" set forth in the policy, it contains a one-year limitations clause which provides that:

> **SECTION 1 – CONDITIONS**
>
> 6. **Suits Against Us.**  No action shall be brought unless there has been compliance with the policy provisions.  **The action must be started within one year after the date of loss or damage.**

 (*Id.* at 22 (emphasis added)).

> *D.  Plaintiffs' Insurance Claim and Initial Inspection by Defendant*

Plaintiffs timely submitted a claim to State Farm for coverage under their homeowners policy. (*Id.* at ¶ 21). State Farm responded by sending a representative[4] to conduct an initial inspection.  (*Id.* at ¶ 22).  The precise date of this visit is unclear from the Complaint, which provides only that it occurred approximately one month before December 2, 2010.  (*Id.* at ¶ 25). At that time, the representative took photographs of the damage to the home, which had not yet been remedied. (*Id.* at ¶ 22). He also spoke to Cannella about the damage. (*Id.*). State Farm's representative advised the Plaintiffs that a structural engineer would be sent to complete a more thorough inspection of the home. (*Id.* at ¶ 23).  This representative also counseled Plaintiffs to immediately complete the repairs to the home so as to avoid any further damage.  (*Id.*).  Given this instruction, Plaintiffs directed Cannella to complete the repairs to the foundation and Cannella promptly finished the job, mitigating the damage to the home.  (*Id.* at ¶ 24).

> *E.  Inspection by NAE*

State Farm retained Paul White of Nelson Architectural Engineers ("NAE") to evaluate the damage to Plaintiffs' home.  (*Id.* at ¶ 25).  NAE is based in Dallas, Texas. (*Id.* at ¶ 25).

---

[4]        The name of the State Farm representative is not set forth in the Complaint.  However, it appears from the Nelson Architectural Engineers' Report that John Forgrave was the individual who conducted this initial inspection. (Docket No. 1-3 at 44).

Plaintiffs allege that State Farm sought out and chose this company because the "core services" advertised on NAE's website include "Expert Witness, Litigation and Subrogation Resource Support." (*Id.*)  Plaintiffs maintain that because State Farm retained a company based in Dallas which provides litigation services to investigate their claim at their Pittsburgh home, State Farm effectively hired an "adversarial litigation expert" to evaluate their insurance claim.  (*Id.* at ¶¶ 35-37).   However, Plaintiffs conveniently omit other relevant passages from the webpage, including that another of NAE's "core services" is "Consulting Services" and that NAE conducts business "worldwide."[5]  (Docket No. 1-3 at 51).

White arrived at Plaintiffs' home on December 2, 2010 in order to conduct his inspection. (*Id.* at ¶ 25).  All of the remedial repairs were completed before White arrived.  (*Id.* at 26).  White met with and conducted informal interviews of Jerry Palmisano and Cannella.  (*Id.*). Cannella was present at that time in order to provide all of his measurements to the inspector and to show him all of the repairs that he had completed.  Plaintiffs aver that Cannella advised White that the house "had fallen at least six inches and had been jacked back up to that level." (*Id.* at ¶¶ 40-42).  Palmisano and Cannella offered White the opportunity to go under the house and inspect the foundation and completed repairs, but he declined the opportunity.  (*Id.* at 27).  Instead, White allegedly took photographs and sketched the inside and outside of the house.  (*Id.*).

F.      NAE Report

White produced a report detailing his findings from the inspection.  (*Id.* at ¶ 34; 36-50). Plaintiffs maintain that the report "largely ignores or glosses over" much of the information provided by Cannella to White during his inspection.  (*Id.* at ¶¶ 39, 43).  They further contend that the report "presents a biased view of the situation based upon selective information favoring the insurer and ignoring or failing to give proper weight to undisputed evidence and facts

---

[5]        The webpage is attached to Plaintiffs' Complaint.  (Docket No. 1-3 at 51).

favoring a conclusion that would result in State Farm having a coverage obligation to the Palmisanos under the Policy." (*Id.* at ¶ 44).

Plaintiffs have attached the report to their Complaint. (Docket No. 1-3 at 36-51). As such, the Court may fully consider its contents in resolving the present motion to dismiss.

White's report is titled a "Residential Foundation Distress Evaluation" and is dated January 19, 2011.[6] (*Id.* at 36). The purpose of his investigation of Plaintiffs' home was "to provide professional assistance to determine the cause(s) of distress in the structure and its finishes, specifically the cause of damage and appropriate repair to the I-beam below the garage, and also what caused the home to lean and an appropriate repair for this condition." (*Id.*). White details the scope of his investigation, noting that he: conducted a "walk through" of the home; met informally with Mr. Palmisano and Cannella[7]; reviewed photographs of the damage to the home taken by State Farm representative John Forgrave at his earlier visit; and conducted plumbness tests of the walls. (*Id.* at 36-37).

The report provides a detailed summary of the information provided to White by Mr. Palmisano and Cannella. (*Id.* at 38-39). White's summary is largely consistent with the allegations in Plaintiffs' Complaint as to the damage to the home, the measurements taken by Cannella and the repairs he completed. (*Id.*). Of note, they advised White of the following damage to the house: the kitchen floor was deflected or buckled; a beam in the basement was failing; there were cracks in the wall which were not previously present; the house "leaned" to the west; and there was a leak in the sewer line in the crawl space area beneath the game room/basement. (*Id.* at 38-39). White recounts that Cannella advised that the northwest corner of

---

[6]     The Court notes that the report references certain attachments including Photographs and Illustrations which are not attached to the Complaint or part of the Court's record. (Docket No. 1-3 at 40).
[7]     The Court recognizes that the Report refers to Cannella as "Kannel" throughout. It is unclear which is party uses the correct spelling. As such, the Court adopts the spelling used in Plaintiffs' Complaint.

the kitchen was approximately 1 ¾ inches high and the northwest corner of the dining room was measured to be approximately 2 ½ inches low, or a difference of 4 ¼ inches between the two points. (*Id*. at 39). White was also aware of the repairs which were performed to that point in time, including that Cannella had:

- Mudjacked west side to level the house.

- Installed 9 underpins along the back side [west side] of the house.

- Straightened the existing I-beam in the basement below the garage.

- Replaced a segment of the sanitary sewer pipe below the exercise room/game room area. An access hole was created in the storage area of the basement at the west wall.

- Bricks added to support the south side of the I-beam.

- Replaced some [concrete masonry unit] on the north wall and at the northeast corner beneath the garage.

- Straightened floor joist in the crawlspace. Joists were not deteriorated (rotted).

(*Id*.). The summary of White's "site visit observations" indicates that he was plainly aware of the repairs which had been completed. (*Id*. at 40-41). With respect to the wastewater leaks complained of by Plaintiffs and Cannella, White noted that:

> [t]he homeowner and his contractor reported that a leak in the sanitary sewer pipe was found in the crawl space beneath the exercise/game room area. The length of time over which wastewater leaks occur is generally indeterminate. In general, significant time and voluminous leakage would be required to accumulate an amount of wastewater sufficient to influence the volumetric stability of the subgrade. If a sufficient volume of water were available, the influence would generally be limited although migration through granular or loose fill in plumbing trenches should also be considered to the area of the leak.

(*Id*. at 45).

8

White's report concluded that "distress reported at the I-beam . . . is in my opinion, a result of long-term wear and movement at the CMU [(concrete masonry unit)] south wall beneath the garage.  Influences contributing to the distress at the I-beam, as well as distress at multiple other areas on the CMU walls, include hydrostatic and soil pressures in the soils outside the walls in conjunction with long-term differential movement of the foundation supporting the walls. . . . [T]he distress . . . at the CMU walls of the basement beneath the garage indicate movement . . . in the walls.  This movement correlates to the distress, and rotation, at the I-beam." (*Id.*).  In response to the assertion that the house was "leaning" west, White declared that the "lean was relatively small." (*Id.*).  White also determined that "the distress at the I-beam is unrelated to the reported leaning of the structure or the reported sag in the kitchen floor." (*Id.* at 46).

In reaching these decisions, White noted that the information he had received to that point from Plaintiffs and Cannella as to the damaged condition of the property before the remedial repairs was insufficient to "fully evaluate the cause and extent of the reported lean." (*Id.* at 45).  He suggested that he required additional information including, "details of the conditions before the house was leveled as reported by [Cannella] including physical measurements of the lean or any separations; … the number of underpins, location of underpins, and the amount of lift." (*Id.*).  In addition, among the many "limitations" set forth at the end of the report, White states that "[i]n the event that additional information becomes available that could affect the conclusions reached in this investigation this office reserves the right to review, and, if required, change some or all of the opinions presented herein." (*Id.* at 49).  Plaintiffs have not alleged that any additional information was provided to State Farm or NAE. (*See* Docket No. 1-3).

G.      *State Farm's Denial of Coverage and Subsequent Action*

Through a letter dated January 25, 2011 from Claim Representative Jonathan Forgrave, State Farm denied coverage for Plaintiffs' insurance claim.  (Docket No. 1-3 at ¶ 28, pp. 33-35). In its decision, State Farm relied on the report prepared by White of NAE, an "independent structural engineer." (*Id.*).  State Farm concurred with White that the damage to the house was the "result of long-term wear and movement of the south wall beneath the garage influenced by hydrostatic and soil pressures in conjunction with long-term differential movement of the foundation supporting walls." (*Id.* at 33).  Forgrave concluded that "this type of damage is specifically excluded under your Homeowners Policy … and, therefore, coverage is unavailable for your loss." (*Id.*).   In support, Forgrave fully quoted the exclusion provisions which are detailed in Section B above.  (*Id.* at 33-35).  He also quoted the suit limitation clause contained in the "Conditions" section which requires any legal action to be "started within one year after the date of loss or damage" and noted that by specifying the grounds for denial State Farm was not waiving but reserving all of its rights to assert other defenses applicable to Plaintiffs' claim. (*Id.* at 35).

Plaintiffs note that "[o]n or about February 13, 2011, [Plaintiffs] received a notice that the structural engineer's invoice was being paid as a claim under the Policy."  (Docket No. 1-3 at ¶ 45).  "Thus, not only did State Farm retain an adversarial, purported 'expert witness' service to assess [Plaintiffs'] claim, State Farm charged this expense against [Plaintiffs'] Policy."  (*Id.* at ¶ 46).  A copy of Defendant's letter informing Plaintiffs that the expense from the inspection was being charged to their policy is attached to the docket as Exhibit D.  (Doc. No. 1-3 at 52).

H.      *Plaintiffs' Claims*

With respect to their breach of contract claim, Plaintiffs allege that they made all required premium payments under the policy and that State Farm breached the policy by denying coverage for their claim.  (*Id.* at ¶¶ 47-51).  They specifically allege that:

> State Farm's denial of coverage is in error.  Contrary to State Farm's conclusion, the damage to the home was caused by the sewer water that had accumulated as a result of the separation of the main sewer pipe, which caused the deterioration and sinking and/or collapse of the foundation.  These issues with the foundation, in turn, caused stress on the structure of the home, including the support I-beams, resulting buckling of the floor, cracks in the walls, shifting and sinking of the home, and other damage to the home.

(Docket No. 1-3 at ¶ 30).  They further contend that to the extent that the damage was caused in this manner, that State Farm had a duty and obligation to provide coverage under the policy and thereby breached these obligations when it denied coverage.  (*Id.* at ¶ 32).  Plaintiffs request damages in excess of $50,000.00, along with interest, costs, and all other available relief.  (*Id.* at ¶ 51).

As to their bad faith claim, Plaintiffs allege that State Farm acted in bad faith:

> a. by failing to fairly and properly investigate the claim;

> a.[8] by denying its clearly-established coverage obligations under the Policy;

> b. by repeatedly asserting bases for denying or attempting to deny coverage that have no basis in fact or law and by ignoring information in its possession refuting the denial of coverage;

> c. by engaging in improper, unfair, and unlawful claims handling and insurance practices;

> d. by violating the fiduciary duty owed its insured;

> e. by engaging in an adversarial relationship with the Palmisanos;

---

[8]     The Court notes that Plaintiffs' Complaint contains two subparagraph (a)s.

> f. by violating the legal requirements for proper insurance practices; and
>
> g. by requiring the plaintiff to expend funds for counsel fees to obtain and/or retain coverage for which the plaintiff has already paid.

(*Id.* at ¶ 53).  They also assert that State Farm "acted willfully, fraudulently, intentionally and in bad faith in refusing to provide coverage and indemnity for the Palmisanos' loss without any contractual or legal basis" and "acted knowingly, intentionally and/or recklessly for the purpose of discouraging the Palmisanos from pursuing a claim against State Farm and/or avoiding the payment(s) due to the Palmisanos under the terms of the policy."  (*Id.* at ¶¶ 54-55).  Plaintiffs then maintain that "State Farm had no legitimate reason for refusing to pay the Palmisanos' valid claim."  (*Id.* at ¶ 56).  Plaintiffs seek consequential damages, punitive damages and attorneys' fees for the alleged bad faith conduct.  (*Id.*).

## III.   PROCEDURAL HISTORY

Plaintiffs initiated this case by filing a Praecipe for Writ of Summons in the Court of Common Pleas of Allegheny County, Pennsylvania on January 23, 2012.  (Docket No 1-2 pgs. 1-2).  Plaintiffs subsequently filed their Complaint in the Court of Common Pleas on May 31, 2012.  (Docket No. 1-3 pgs. 1-15).  State Farm then timely removed the case to this Court based on diversity jurisdiction.  (Docket No. 1).

State Farm filed its Motion to Dismiss and Brief in Support on July 3, 2012.  (Docket Nos. 4, 5).   Plaintiffs countered by filing their Response in Opposition on July 24, 2012. (Docket No. 8).  State Farm then submitted its Reply Brief on August 3, 2012.  (Docket No. 9). The parties have not requested that they be permitted to engage in any further briefing; thus, this matter is fully briefed and ripe for disposition.

## IV.   LEGAL STANDARD

A motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6) challenges the legal sufficiency of a complaint.  The United States Supreme Court has held that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955 (2007) (citing *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932 (1986)) (alterations in original).

The Court must accept as true all well-pleaded facts and allegations and must draw all reasonable inferences therefrom in favor of the plaintiff.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949-50 (2009); *Twombly*, 550 U.S. at 555.  As the Supreme Court made clear in *Twombly*, however, the "factual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  The Supreme Court has subsequently broadened the scope of this requirement, stating that "only a complaint that states a plausible claim for relief survives a motion to dismiss."  *Iqbal*, 129 S. Ct. at 1950 (citing *Twombly*, 550 U.S. at 556).  This standard requires showing "more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 556).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief."  *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 557).  "This 'plausibility' determination will be 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009) (quoting *Iqbal*, 129 S. Ct. at 1949).

After *Iqbal*, the United States Court of Appeals for the Third Circuit explained that a district court must conduct the following analysis to determine the sufficiency of a complaint:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify

> allegations that, "because they are no more than conclusions, are
> not entitled to the assumption of truth." Finally, "where there are
> well-pleaded factual allegations, a court should assume their
> veracity and then determine whether they plausibly give rise to an
> entitlement for relief."

*Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010) (quoting *Iqbal*, 129 S. Ct. at

1947, 1950); *see also Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011), *cert.*

*denied*, 2012 WL 296904 (Apr. 2, 2012); *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).

   *Twombly* and *Iqbal* have not changed the other pleading standards for a motion to dismiss

pursuant to FED. R. CIV. P. 12(b)(6), and the requirements of FED. R. CIV. P. 8 must still be

met. *See Burtch*, 662 F.3d at 220. Rule 8 requires a showing, rather than a blanket assertion, of

entitlement to relief, and "contemplates the statement of circumstances, occurrences, and events

in support of the claim presented and does not authorize a pleader's bare averment that he wants

relief and is entitled to it." *Twombly*, 550 U.S. at 555 n.3 (internal alterations, citations, and

quotations omitted). The Supreme Court has explained that a complaint need not be "a model of

the careful drafter's art" or "pin plaintiffs' claim for relief to a precise legal theory" so long as it

states "a plausible 'short and plain' statement of the plaintiff's claim." *Skinner v. Switzer*, ---

U.S. ---, 131 S. Ct. 1289, 1296 (2011); *see also Matrixx Initiatives, Inc. v. Siracusano*, --- U.S. --

-, 131 S. Ct. 1309, 1322 n.12 (2011) (emphasizing that "to survive a motion to dismiss,

respondents need only allege 'enough facts to state a claim to relief that is plausible on its face'")

(quoting *Twombly*, 550 U.S. at 570)).

   In deciding a Rule 12(b)(6) motion to dismiss, the Court may consider "only the

allegations in the complaint, exhibits attached to the complaint, matters of public record, and

documents that form the basis of a claim." *Lum v. Bank of Am.*, 361 F.3d 217, 222 n. 3 (3d Cir.

2004). "The purpose of this rule is to avoid the situation where a plaintiff with a legally deficient

14

claim that is based on a particular document can avoid dismissal of that claim by failing to attach the relied upon document." *Lum*, 361 F.3d at 222.  A document forms the basis of a claim if it is "*integral to or explicitly relied upon* in the complaint." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.,* 184 F.3d 280, 287 (3d Cir. 1999) (emphasis in original; internal citations and quotations omitted).

## V.   DISCUSSION

State Farm argues that Plaintiffs' breach of contract claim is barred by the one-year contractual limitations period in their policy and that they have failed to sufficiently plead a claim for bad faith under § 8371.  (Docket Nos. 4-5).  Plaintiffs maintain that their claims are sufficiently pled to survive the instant motions to dismiss.  (Docket No. 8 at 5-10).  The parties do not dispute that substantive Pennsylvania law applies to both the breach of contract and bad faith claims.  (*See* Docket Nos. 4, 5, 8, 9).  The Court agrees that Pennsylvania law applies to both claims.  The Court will now discuss the parties' positions as to each claim, in turn.

### A.  Breach of Contract Claim

The statute of limitations for a breach of contract claim under Pennsylvania law is generally a period of four (4) years.  42 Pa. C.S. § 5525.  However, the parties to a contract may validly limit the limitations period to a shorter time "which is not manifestly unreasonable." 42 Pa. C.S. § 5501.  Contractual limitations periods of one year in insurance policies have routinely been upheld as reasonable in Pennsylvanian courts.  *See Lardas v. Underwriters Ins. Co.*, 426 Pa. 47, 231 A.2d 740, 741 (Pa. 1967) (noting that 12 month suit limitation period was reasonable)*; see also Prime Medica Assoc. v. Valley Forge Ins. Co.,* 970 A.2d 1149, 1156 (Pa. Super. Ct. 2009) ("Pennsylvania law recognizes as valid suit limitation clauses in insurance policies."). Federal courts applying Pennsylvania law have reached the same conclusion.  *See Atiyeh v. National Fire Ins. Co. of Hartford,* Civ. A. No. 07-cv-04798, 2008 WL 4444253, at *4-5

(E.D.Pa. Sept. 30, 2008); *see also McElhiney v. Allstate Ins. Co.*, 33 F. Supp. 2d 405, 406 (E.D.Pa. 1999).

Here, the limitation clause in the insurance policy provides that: "**Suits Against Us.**  No action shall be brought unless there has been compliance with the policy provisions.  The action must be started within one year after the date of loss or damage."  (Docket No. 4-1 at 22 (emphasis in original)).  The loss or damage in this case occurred on October 9, 2010 and this lawsuit was initiated, at the earliest, when Plaintiffs filed a praecipe for writ of summons in the Court of Common Pleas on January 23, 2012.  *See Gold v. State Farm Fire and Cas. Co.*, --- F.Supp.2d ----, 2012 WL 3020352, at *5 (E.D.Pa. Jul. 24, 2012) (citing Pa. R. Civ. P. 1007) (noting that an action is generally considered to have commenced upon the filing of a praecipe absent evidence that the plaintiff did not make a good faith effort at service).  Thus, if the contractual limitation is reasonable, Plaintiffs' breach of contract claim is untimely because it was filed outside the one-year limitations period.

Plaintiffs set forth two arguments in opposition, neither of which are sufficient to overcome the application of the contractual limitations period.  (Docket No. 8 at 6).  They first contend that the Court should follow the District Court's holding in *Margolis v. State Farm Fire & Casualty Co.,* 810 F. Supp. 637 (E.D. Pa. 1992), that a one-year limitations clause in a casualty insurance policy was manifestly unreasonable as violative of Pennsylvania insurance law.  (*Id.*).  However, *Margolis* is a non-binding and outdated decision which is not persuasive to this Court.  Indeed, in *McElhiney v. Allstate Ins. Co.*, 33 F. Supp 2d. 405, 407-08 (E.D. Pa. 1999), the Court convincingly explains why *Margolis* should not be followed.  As the Court in *McElhiney* details, the statutory basis for the *Margolis* decision, 40 Pa.Stat.Ann. § 753, was incorrectly interpreted to apply to a casualty insurance policy, while that section plainly applies

16

to only health and accident policies. *McElhiney*, 33 F. Supp. 2d at 407-08. This Court agrees with *McElhiney* and further recognizes that the vast majority of cases hold that such clauses are reasonable in casualty policies. *See Lardas*, 231 A.2d at 741; *see also Prime Medica Assoc.*, 970 A.2d at 1156.

Plaintiffs next maintain that the contractual limitations defense should be rejected because "State Farm should not be permitted to benefit from its alleged bad faith conduct." (Docket No. 8 at 6). They further reason that "State Farm should not be permitted to rely upon a technical policy defense to coverage when it has breached both its common law and contractual duties of good faith and fair dealing to its insured." (*Id.*). As State Farm points out, Plaintiffs have not cited any authority supporting their proposition that an allegation that the insurance company breached the insurance policy or acted in bad faith is sufficient to save an otherwise untimely claim. (Docket No. 9). To this end, the cases teach that bad faith insurance practices which do not include acts of misleading the insured as to the applicability of the contractual limitations period or causing intentional delays to avoid coverage do not preclude an insurance company from raising a suit limitations clause as a defense. *See McElhiney*, 33 F. Supp. 2d at 408 ("we conclude that any bad faith failure to investigate and pay an insurance claim on the part of Allstate does not preclude it from asserting the suit limitation clause against plaintiffs on their breach of contract claim").

Pennsylvania courts have recognized limited exceptions to the application of an otherwise valid contractual limitations clause, including that such clauses may be defeated by estoppel or waiver. *See Prime Medica Assoc.*, 970 A.2d at 1156-57. To succeed on either theory, a plaintiff must set forth a factual basis to demonstrate "reasonable grounds for believing that the time limit would be extended or that the insurer would not strictly enforce the suit

limitation provision." *Id.* (internal quotation omitted).   In this Court's estimation, Plaintiffs' Complaint is devoid of any facts which would state a plausible claim that etoppel or waiver may apply.   Indeed, the facts pled show that State Farm promptly investigated Plaintiffs' claim and reached its coverage decision in less than four (4) months.   To this end, Plaintiffs identified the loss on October 9, 2010.  (Docket No. 1-3 at ¶ 21).   State Farm sent out its claims representative in late October or early November to conduct an initial evaluation of the damage to the home. (*Id.* at ¶ 22).   State Farm commissioned the follow-up evaluation by an independent structural engineer which was completed on December 2, 2010.  (*Id.* at ¶ 25).   Plaintiffs were ultimately notified of State Farm's decision informally by telephone on January 24, 2011 and in a letter dated January 25, 2011.  (*Id.* at ¶ 28; Ex. B).   Given these circumstances, Plaintiffs could not plausibly claim that State Farm should be estopped from asserting its defense.

It is equally clear that Plaintiffs could not plausibly assert that waiver should bar the application of the limitations clause.   The contractual limitations clause is clearly set forth in the policy, (*see* Docket No. 4-1 at 22), which the insured has a duty to read and is presumed to understand, *see Schoble v. Cvhoble*, 349 Pa. 408, 37 A.2d 604 (Pa. 1944); *see also Schilachi v. Flying Dutchman Motorcycle Club*, 751 F. Supp. 1169, 1174-75 (E.D Pa. 2000).   State Farm then quoted the entirety of the limitations clause in its denial letter dated January 25, 2011, plainly reminding Plaintiffs that it intended to enforce the clause.  (Docket No. 1-3 at 35).   As the limitations period did not expire until October 9, 2011, Plaintiffs had nearly nine months to timely initiate this action after their claim was denied but did not do so.

For these reasons, the Court finds that the contractual limitations clause is reasonable and should be enforced.  *See Prime Medica,* 970 A.2d at 1156.   As such, State Farm's motion to dismiss Plaintiffs' breach of contract claim is granted.

### B. Bad Faith

The Court next turns to State Farm's challenge to Plaintiffs' bad faith claim in light of the application of the pleading standards set forth in *Twombly* and *Iqbal*. At the outset, the Court recognizes that bad faith is generally an independent cause of action separate from the contract claim. *See Gold v. State Farm Fire and Cas. Co.*, --- F. Supp. 2d -----, 2012 WL at *8-9 (E.D. Pa. Jul. 24, 2012). In addition, Plaintiffs are not precluded from potentially recovering under a bad faith theory solely because the contractual limitations period has been enforced and the breach of contract claim has been dismissed. *See Atiyeh*, 2008 WL 4444253, at *7 (citing *March v. Paradise Mut. Ins. Co.*, 646 A.2d 1254, 1256 (Pa. Super. Ct. 1994)) ("a claim for bad faith can survive even if plaintiff's breach of contract claim is barred by the policy's limitation provision."). Thus, the Court must fully evaluate the parties' arguments as to the bad faith claim.

To establish a bad faith claim under Pennsylvania law, "'a plaintiff must show by clear and convincing evidence that the insurer (1) did not have a reasonable basis for denying benefits under the policy and (2) knew or recklessly disregarded its lack of a reasonable basis in denying the claim.'" *Post v. St. Paul Travelers Ins. Co.*, 10-3088, --- F.3d ----, 2012 WL 3095352, at *21 (3d Cir. July 31, 2012) (quoting *Condio v. Erie Ins. Exch.*, 899 A.2d 1136, 1143 (Pa. Super. Ct. 2006)).

> "Bad faith" on [the] part of [an] insurer is any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (i.e., good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith.

*Post*, 2012 WL 3095352, at *21 (quoting *Terletsky v. Prudential Prop. & Cas. Ins. Co.*, 649 A.2d 680, 688 (Pa.Super.Ct.1994)) (further quotation omitted). "[A]n insurer may defeat a claim

of bad faith by showing that it had a reasonable basis for its actions." *Amica Mut. Ins. Co. v. Fogel*, 656 F.3d 167, 179 (3d Cir. 2011).

Many federal district courts have recently been called upon to evaluate bad faith complaints in light of *Iqbal* and *Twombly*. Under these Supreme Court decisions, plaintiffs must plead sufficient facts to make out a plausible claim for relief against the defendant. *See Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 557). In the bad faith context, district courts have required more than "conclusory" or "bare-bones" allegations that an insurance company acted in bad faith by listing a number of generalized accusations without sufficient factual support. *See e.g., Liberty Ins. Corp. v. PGT Trucking, Inc.*, Civ. A. No. 11–151, 2011 WL 2552531, at *4 (W.D.Pa. Jun. 27, 2011); *Pfister v. State Farm Fire & Cas. Co.*, Civ. A. No. 11-799, 2011 WL 3651349 (W.D. Pa. Aug. 18, 2011); *Atiyeh*, 742 F. Supp. 2d at 599 ("However, these averments are merely conclusory legal statements and not factual averments."). For example, in *Liberty Ins. Corp. v. PGT Trucking*, the Honorable Terrence F. McVerry of this Court found that a pleading was deficient as it set forth only a "laundry list" of many such generalized accusations, including, among other things, that the insurer had: failed to adequately investigate; failed to settle at appropriate values; failed to act in the best interest of the insured; and/or failed to adequately protect the insured's interests. *Liberty Ins. Corp.*, 2011 WL 2552531 at *4.[9] Judge McVerry held that these types of allegations were insufficient because they were

---

[9]     The Honorable Arthur J. Schwab rejected similar allegations in *Pfister v. State Farm Fire & Cas. Co.*, 2011 WL 3651349. The deficient pleading in that case stated merely that the insurer:

> 1) failed "to conduct a complete and thorough investigation of the claim"; 2) failed to "objectively and fairly value Plaintiffs' claim"; 3) relied upon an estimate compiled by its own consultant while ignoring an estimate provided by Plaintiffs; 4) "failed to negotiate the claim in good faith"; 5) failed to "respond to Plaintiffs' additional written request to discuss resolution of the claim without litigation"; an d 6) "failed to provide a reasonable factual explanation of the basis for Defendant's refusal" to pay the full amount sought by Plaintiffs.

*Id.*

20

not supported by any facts which "describe who, what, where, when, and how the alleged bad faith occurred." *Id.*

Plaintiffs' bad faith claim fails for similar reasons. They allege generally that State Farm acted in bad faith:

> a. by failing to fairly and properly investigate the claim;
>
> a. by denying its clearly-established coverage obligations under the Policy;
>
> b. by repeatedly asserting bases for denying or attempting to deny coverage that have no basis in fact or law and by ignoring information in its possession refuting the denial of coverage;
>
> c. by engaging in improper, unfair, and unlawful claims handling and insurance practices;
>
> d. by violating the fiduciary duty owed its insured;
>
> e. by engaging in an adversarial relationship with the Palmisanos;
>
> f. by violating the legal requirements for proper insurance practices; and
>
> g. by requiring the plaintiff to expend funds for counsel fees to obtain and/or retain coverage for which the plaintiff has already paid.

(Docket No. 1-3 at ¶ 54). They further aver in a conclusory fashion that State Farm:

- "acted willfully, fraudulently, intentionally and in bad faith in refusing to provide coverage and indemnity for the Palmisanos' loss without any contractual or legal basis";

- "acted knowingly, intentionally and/or recklessly for the purpose of discouraging the Palmisanos from pursuing a claim against State Farm and/or avoiding the payment(s) due to the Palmisanos under the terms of the policy."; and

- "State Farm had no legitimate reason for refusing to pay the Palmisanos' valid claim."

(*Id.* at ¶¶ 55-56).   These types of generalized accusations are insufficient without supporting facts setting forth "who, what, where, when, and how the alleged bad faith occurred." *Liberty Ins. Corp.*, 2011 WL 2552531 at *4.

In this Court's estimation, the facts pled by Plaintiffs in an attempt to establish bad faith are not enough to sustain a bad faith claim under Pennsylvania law.  *See Post*, 2012 WL 3095352, at *21; *see also Liberty Ins. Corp.*, 2011 WL 2552531 at *4.    Stripped of its conclusory averments, Plaintiffs' Complaint essentially alleges that State Farm acted in bad faith by retaining an "adversarial litigation expert," i.e., Paul White of NAE, to evaluate their insurance claim.  (Docket No. 1-3 at ¶¶ 35-37).   Plaintiffs concede that such litigation animus was "unbeknownst to them" at the time but aver that because NAE advertises as its "core services" that it provides, among other things, expert witness, litigation and subrogation services, State Farm must have engaged it for litigation purposes.  (*Id.*).   As further support of the supposed litigation animus, Plaintiffs point to the fact that NAE is based in Texas[10] but was retained to conduct the investigation in Pittsburgh.  (*Id.* at ¶34).   The Court finds that these facts are insignificant and certainly do not show "who, what, when, why or how" State Farm acted in bad faith toward Plaintiffs.  Further, when the Court considers the entire passage of the webpage attached to their Complaint upon which Plaintiffs rely, NAE also provides "consulting services" and operates "worldwide," with multiple offices across the country, undermining Plaintiffs' apparent suggestion that State Farm flew in an expert witness from Texas to stifle their claim. (Docket No. 1-3 at 51).

At most, Plaintiffs have pled a breach of contract claim alleging that the denial of coverage by State Farm was "in error" because White conducted a cursory investigation and allegedly "glossed over" or "ignored" certain information that they provided him.  (*Id.* at ¶¶ 39,

---

[10]       The Court notes that State Farm is based in Bloomington, Illinois.  (See Docket No. 1 at ¶ 9).

43).  But, "'mere negligence or bad judgment is not bad faith,'" and "'bad faith must be proven by clear and convincing evidence and cannot be merely insinuated.'"  *Brewer*, 446 F. App'x at 510 (quoting *Terletsky*, 649 A.2d at 688).  There is simply no factual support for Plaintiffs' conclusory allegations concerning State Farm's alleged bad faith conduct and their averments surely do not suffice to allege a plausible claim that could sustain their burden at trial.  *See Amica Mut. Ins. Co.*, 656 F.3d at 179 (quotation omitted) ("this heightened standard requires the insured to provide evidence so clear, direct, weighty and convincing as to enable a clear conviction, without hesitation, about whether or not the defendants acted in bad faith.").

"[A]n insurer may defeat a claim of bad faith by showing that it had a reasonable basis for its actions."  *Amica Mut. Ins. Co.*, 656 F.3d at 179.  This is a defense to a bad faith claim which is typically evaluated by the Court at the summary judgment stage based on evidence submitted by both parties.  *Id.*  Although we are at the motion to dismiss stage, the Court's record already includes this type of evidence because Plaintiffs have attached their insurance policy, State Farm's denial letter and the NAE report to their Complaint and these materials may be considered without converting the motion to one for summary judgment.[11]  (*See* Docket No. 1-3).  By placing these matters before the Court, Plaintiffs are "on notice that the document[s] will be considered."  *Lum*, 361 F.3d at 221 n.3.  As such, the Court can more fully consider the defense posture in the present case.

"Pennsylvania law provides that it is not bad faith to conduct a thorough investigation into a questionable claim."  *Nw. Mut. Life Ins. Co. v. Babayan*, 430 F.3d 121, 138 (3d Cir. 2005); *see also Cantor v. Equitable Life Assurance Soc'y of the U.S.*, No. 97–5711, 1999 WL 219786, at *3 (E.D. Pa. Apr. 12, 1999) ("Courts repeatedly have held that an insurance company's

---

[11]     As is set forth in n.3, *supra*, the Court considers the policy in effect on the date of the loss, which was filed by State Farm.  (Docket No. 4-1).

substantial, thorough investigation, based upon which the insurance company refuses to make or continue benefit payments, establishes a reasonable basis that defeats a bad faith claim.").   It is likewise not bad faith "where the insurer made a reasonable legal conclusion based on an area of the law that is uncertain or in flux."  *Id.* (citing *Terletsky*, 649 A.2d at 688-89).   Additionally, courts have recognized that an insurer's reasonable reliance on an engineering expert's report for a coverage decision does not constitute bad faith.  *See El Bor Corp. v. Fireman's Fund Ins. Co.*, 787 F. Supp. 2d 341, 349 (E.D. Pa. 2011) (insurance company's reliance on engineer report's findings as a basis for denial of coverage "provide[d] reasonable grounds to deny benefits").

Here, Plaintiffs do not contest that State Farm relied upon the NAE report in its denial of coverage or argue that, if the conclusions in the NAE report were accepted, their losses would not be excluded from coverage under the provisions quoted by State Farm in its denial letter. (*See* Docket No. 1-3 at ¶ 33 ("Nelson's report, upon which State Farm relied to deny coverage under the Policy"); *see also* Docket No. 8, generally).   They primarily argue that it was unreasonable for State Farm to rely on the report because the investigation by NAE "glossed over" or "ignored" certain information provided by Plaintiffs. This Court believes that Plaintiffs' claim that this information was "overlooked" is completely refuted by the report.  (Docket No. 1-3 at ¶¶ 39, 43).   In fact, White's summary of the information which is contained in the report with respect to the damage to the home, the measurements taken by Cannella and the repairs he completed is consistent with the allegations Plaintiffs make in their Complaint concerning these issues.  (*Compare* Docket No. 1-3 at ¶¶ 8-20, 40-41, *with* Docket No. 1-3 at 38-39).   Thus, without these facts, Plaintiffs' claim is reduced to a dispute about the conclusions reached by White in his report rather than any bad faith mishandling of the investigation.[12]

---

[12]     The Court notes that the allegation that State Farm charged NAE's fees "against their policy" does not constitute bad faith.  (Docket No. 1-3 at ¶¶ 44-45; Docket No. 1-3 at 52).  Plaintiffs have not alleged that they were

Their allegations are further undermined by White's statements in the report that he lacked sufficient information to fully evaluate the supposed "lean" of the house but that he reserved the right to change his opinions, and his report, if additional information was provided. (Docket No. 1-3 at 45, 49). Plaintiffs have not alleged that they submitted any additional information to State Farm or took any action after they received the denial letter from State Farm before filing suit. (*See generally* Docket No. 1-3). As such, they cannot demonstrate that State Farm's reliance on White's report was without a reasonable basis.

In all, the Court finds that State Farm had a reasonable basis to rely on the conclusions of the structural engineer's report as to the cause of the damage to Plaintiffs' home and deny coverage under the exclusions cited in its letter. *See El Bor Corp.*, 787 F. Supp. 2d at 349. NAE determined that the cause of the damage was the "result of long-term wear and movement of the south wall beneath the garage influenced by hydrostatic and soil pressures in conjunction with long-term differential movement of the foundation supporting walls." (Docket No. 1-3 at 45). The policy specifically excluded coverage for losses to the home caused by: earth movement including "subsidence, erosion or movement resulting from improper compaction"; water damage meaning "water below the surface of the ground, including water which exerts pressure on, or seeps or leaks through a … foundation"; and "defects in the design, specifications, workmanship, construction, grading, [or] compaction." (Docket No. 4-1 at 17-18). Given NAE's findings, State Farm had a reasonable basis to deny coverage under the cited exclusions. *See El Bor Corp.*, 787 F. Supp. 2d at 349.

---

directly required to pay this fee nor that this type of administrative expense increased their premiums or otherwise affected them in any fashion. (*See* Docket No. 1-3). Even if they had, the total amount of this charge was $3,755.00. (*Id.* at 52). Since the remainder of Plaintiffs' claims must be dismissed, the value of this portion of the claim, if any, certainly takes it below the $75,000 threshold of diversity jurisdiction which would necessitate dismissal for lack of jurisdiction. For these reasons, no further discussion of this "charge" is warranted.

For these additional reasons, Defendant's motion to dismiss Plaintiffs' bad faith claim is granted.

C.     Leave to Amend

In their response to State Farm's Motion, Plaintiffs "request leave to file an amended complaint to address any issues the Court may have" if the motion to dismiss is granted.  (Docket No. 8).  Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that leave to amend should be freely granted "when justice so requires."  The "grant or denial of an opportunity to amend is within the discretion of the District Court." *Foman v. Davis*, 371 U.S. 178, 182 (1962).  "Among the grounds that justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice and futility." *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997)).  A proposed amendment is futile if "the complaint, as amended, would fail to state a claim upon which relief could be granted." *Shane*, 213 F.3d at 115 (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1434).

Plaintiffs have not provided a proposed amended complaint for the Court to evaluate to determine if leave to amend is warranted.  *See Graham v. Progressive Direct Ins. Co.*, 271 F.R.D. 112 (W.D. Pa. Sept. 15, 2010) (discussing motion for leave to amend and evaluating a proposed amended complaint).  Nor have they set forth any additional facts in their response to State Farm's motion to dismiss which would indicate that they could sufficiently plead either of their claims to overcome State Farm's defenses.  (*See* Docket No. 8).  As is discussed above, Plaintiffs' breach of contract claim is untimely and barred by the contractual limitations clause in the policy.  In addition, their bad faith claim is insufficiently pled under *Iqbal* and *Twombly*, and, more importantly, the record before the Court demonstrates that State Farm had a reasonable

basis to deny coverage in reliance on the NAE report and the exclusions in the policy. Moreover, Plaintiffs' bad faith claim relies on an alleged litigation animus against them by State Farm but they have pled that this conduct was "unbeknownst to them" at the time, which suggests that they do not have any additional factual information to include in a potential amended complaint.   (Docket No. 1-3 at ¶ 37).   Therefore, the Court concludes that leave to amend either claim would be futile.   *See Shane*, 213 F.3d at 115.   Accordingly, Plaintiffs' claims will be dismissed, with prejudice.

VI.   CONCLUSION

Based on the foregoing, Defendant's Motion to Dismiss [4] is GRANTED and Plaintiffs' breach of contract and bad faith claims are dismissed, with prejudice.   An appropriate order follows.


*s/Nora Barry Fischer*
Nora Barry Fischer
U.S. District Judge

Date:   August 20, 2012

cc:      All counsel of record